UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

JUAN CRUZ MENDEZ RAMIREZ,                          :
                                                   :
                                     Petitioner,   :
                                                   :
                   -against-                       :
                                                   :               1:19-cv-11012-GHW
THOMAS DECKER, in his official capacity as         :
Field Office Director of the Immigration and       :
Customs Enforcement ("ICE") New York City          :               MEMORANDUM OPINION
Field Office, SCOTT MECHKOWSKI, in his             :                    AND ORDER
official capacity as Assistant Field Office Director :
for the ICE New York City Field Office, U.S.       :
DEPARTMENT OF HOMELAND SECURITY,                   :
CHAD WOLF, in his official capacity as Acting      :
Secretary of DHS, and WILLIAM PELHAM               :
BARR, in his official capacity as the Attorney     :
General of the United States,                      :
                                                   :
                                   Respondents.    :
                                                   :
------------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

When Petitioner Juan Cruz Mendez Ramirez first presented himself to United States'

immigration authorities at the border in Roma, Texas, he was seventeen years old. He was also

alone. And he did not have authorization to enter this country legally. Therefore, Mr. Mendez

Ramirez was designated as an unaccompanied alien child ("UAC") and released to live with his

mother, who resides in New York. Mr. Mendez Ramirez was subsequently ordered removed by an

immigration judge. However, he was not immediately apprehended to commence his removal

proceedings. Rather, Mr. Mendez Ramirez continued to live with his mother in New York.

After he turned eighteen, Mr. Mendez Ramirez was charged with two misdemeanors in New

York state court. Although those charges were dropped, he was then arrested by federal

immigration authorities and detained pending his deportation. While detained, Mr. Mendez Ramirez

filed motions to stay his deportation and reopen his immigration proceedings, both of which were granted. Mr. Mendez Ramirez also filed an application for asylum, which was granted by an immigration judge; however, the government timely appealed that determination.

Mr. Mendez Ramirez filed this petition for habeas corpus arguing that his statutory and constitutional rights have been violated by his prolonged detention. Because Mr. Mendez Ramirez no longer met the statutory definition of a UAC when he was arrested by Immigration and Customs Enforcement ("ICE"), he is not entitled to the legal protections afforded to UACs. And because Congress has authorized—and indeed directed—that immigrants without legal authorization be detained during the pendency of their removal proceedings, Mr. Mendez Ramirez's detention does not violate his due process rights. Accordingly, Mr. Mendez Ramirez's habeas corpus petition is DENIED.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

"Congress has established the requirements for admission of aliens that arrive at the border without authorization to enter." *Lopez v. Sessions*, No. 18 CIV. 4189 (RWS), 2018 WL 2932726, at *4 (S.D.N.Y. June 12, 2018) (citing 8 U.S.C. § 1225 ("Section 1225")). Pursuant to Section 1225(a), "aliens who arrive at the nation's borders" without authorization to enter this country "are deemed 'applicants for admission,' [or 'arriving aliens'] and must be inspected by an immigration official before being granted admission." *Id.* (citing 8 U.S.C. § 1225(a)(1), (3)). "Under Section 1225(b), 'if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229(a) of this title [i.e., a removal proceeding].'" *Id.* (quoting 8 U.S.C. § 1225(b)(2)(A)) (brackets in original). Thus, detention is mandatory for arriving aliens subject to Section 1225(b).

If an arriving alien is subject to mandatory detention under Section 1225(b), "an immigration judge 'may not' conduct a bond hearing to determine whether an arriving alien should be released

into the United States during removal proceedings." *Id.* (quoting 8 C.F.R. § 1003.19(h)(2)(i)(B))

("Section 1003"). However, arriving aliens who are detained pursuant to Section 1225(b)(2)(A) may

be released from custody pursuant to DHS's discretionary parole authority. *See* 8 U.S.C.

§ 1182(d)(5)(A) ("Section 1182").

Under Section 1182(d)(5)(A), DHS "may . . . in [its] discretion parole into the United States

temporarily under such conditions as [it] may prescribe only on a case-by-case basis for urgent

humanitarian reasons or significant public benefit any alien applying for admission to the United

States[.]" *Id.* However, "such parole of such alien shall not be regarded as an admission of the alien

and when the purposes of such parole shall . . . have been served the alien shall forthwith return or

be returned to the custody from which he was paroled[.]" *Id.* "[T]hereafter[,]" a formerly paroled

alien's "case shall continue to be dealt with in the same manner as that of any other applicant for

admission to the United States." *Id.* Regulations interpreting this statutory provision state that

"[m]inors [in DHS custody] may be released to a parent, legal guardian, or adult relative (brother,

sister, aunt, uncle, or grandparent) not in detention." 8 C.F.R. § 212.5(b)(3)(i).[1] However, parole

"would generally be justified only on a case-by-case basis for 'urgent humanitarian reasons['] or

---

[1] This regulatory provision has been enjoined from going into effect because a district court held that it is inconsistent with the *Flores* Settlement. *See Flores v. Barr* (*Flores II*), 407 F. Supp. 3d 909 (C.D. Cal. 2019). "The *Flores* Settlement arose out of a lawsuit first filed by plaintiffs in the Central District of California in 1985, challenging the policies of the Immigration and Naturalization Service (INS) regarding the release of detained minors. In 1997, the district court approved the current Settlement, which defines a 'minor' as 'any person under the age of eighteen (18) years who is detained in the legal custody of the INS' and the certified class as 'all minors who are detained in the legal custody of the INS.'" *Flores v. Sessions* ("*Flores I*"), 862 F.3d 863, 869 (9th Cir. 2017) (cleaned up). The settlement applies to agencies that are successors to the former INS, including DHS. *Id.* The *Flores* Settlement requires that minors in government custody be detained "in the least restrictive setting appropriate to the minor's age and special needs[.]" *Id.* at 869 n.4 (quotation omitted). "The Settlement favors family reunification, and states the order of preference for persons into whose custody detained minors are to be released, provided that detention is not required to secure their appearance before immigration authorities or to ensure the safety of themselves or others." *Id.* at 869.

The district court enjoined enforcement of 8 C.F.R. § 212.5(b)(3)(i)-(ii) in *Flores II* because, in its judgment, those provisions define the scope of when minors may be paroled too narrowly, in a manner that is inconsistent with the *Flores* Settlement. *See Flores II*, 407 F. Supp. 3d at 917 ("Revised 8 C.F.R. section 212.5(b)(3)(i)-(ii) would permit DHS officials to release class members who 'present neither a security risk nor a risk of absconding' only to 'a parent, legal guardian, or adult relative (brother, sister, aunt, uncle, or grandparent) not in detention' or 'with an accompanying parent or legal guardian who is in detention.'"). The district court's injunction is now on appeal to the Ninth Circuit. Despite the district court's injunction, the Court considers this provision helpful insofar as it indicates how DHS has understood the terms "significant public benefit" and "urgent humanitarian reasons" in Section 1182(d)(5)(A).

'significant public benefit' provided the alien poses neither a security risk nor a threat of absconding[.]" *Id.* § 212.5(b) (quoting 8 U.S.C. § 1182(d)(5)(A)). The decision about whether to grant parole "is entirely [within] the agency's discretion and may be revoked at its discretion." *Lopez*, 2018 WL 2932726, at *4 (citing 8 U.S.C. § 1182(d)(5)(A)).

"Unaccompanied alien children" are a subset of arriving aliens. In 2002, Congress enacted the Homeland Security Act ("HSA"), which defines a UAC as a person who: "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2) ("Section 279"). The HSA transferred the responsibility for care of "unaccompanied alien children who are in Federal custody by reason of their immigration status" to the Office of Refugee Resettlement ("ORR") within the Department of Health and Human Services ("HHS"). *Id.* § 279(a), (b)(1)(A). In 2008, Congress enacted the Trafficking Victims Protection Reauthorization Act ("TVPRA"), which requires that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1) ("Section 1232"). The TVPRA transferred responsibility for care and custody of UACs who were in federal custody by virtue of their immigration status to ORR; it did not alter their immigration status.

Section 1232(c)(2) requires ORR to make certain determinations regarding UACs in its custody. Under Section 1232(c)(2)(A), "an unaccompanied alien child in the custody of the Secretary of Health and Human Services shall be promptly placed in the least restrictive setting that is in the best interest of the child. In making such placements, the Secretary may consider danger to self, danger to the community, and risk of flight." *Id.* § 1232(c)(2)(A). The "least restrictive setting" for the placement of a UAC can include releasing the UAC to live with a sponsor pursuant to a Sponsor Care Agreement, although ORR "may not" place a UAC "with a person or entity" until it

has made "a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." *Id.* § 1232(c)(3)(A).

A different statutory subsection applies if a UAC reaches eighteen years of age while in ORR custody. Pursuant to Section 1232(c)(2)(B),

> [i]f a minor described in subparagraph (A) reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight. Such aliens shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home.

*Id.* § 1232(c)(2)(B).

As the plain text of these provisions makes clear, ORR does not have jurisdiction over non-UACs. *See, e.g., D.B. v. Cardall*, 826 F.3d 721, 748 (4th Cir. 2016) (Floyd, J., dissenting) ("A quick skim of the statutes makes plain that [ORR]'s authority runs only to UACs; every relevant statutory grant of authority to [ORR] is conditioned on the existence of an unaccompanied alien child."). As noted above, the HSA and TVPRA transfer jurisdiction over UACs—a subset of arriving aliens who meet the statutory definition of UAC outlined in Section 279(g)(2)—to ORR. DHS retains jurisdiction over all other arriving aliens.

There is a specific regulatory provision that applies to aliens who were formerly designated as UACs. This provision states:

> Aliens who are no longer UACs. When an alien previously determined to have been a UAC has reached the age of 18, when a parent or legal guardian in the United States is available to provide care and physical custody for such an alien, or when such alien has obtained lawful immigration status, the alien is no longer a UAC. An alien who is no longer a UAC is not eligible to receive legal protections limited to UACs under the relevant sections of the Act.

8 C.F.R. § 236.3(d)(2) ("Section 236").

**B. Facts[2]**

Mr. Mendez Ramirez is a native and citizen of Guatemala born on December 14, 2000.

Declaration of Naquan Bacchus ("Bacchus Decl."), Dkt No. 14, ¶ 3; Form I-213, Ex. 1 to

Government Return ("Return"), Dkt No. 12-1. He presented himself to United States Customs and

Border Protection ("CBP") at the United States-Mexico border in Roma, Texas on April 15, 2018.

*Id.* ¶ 4; *see also* Report and Recommendation ("R&R"), Dkt No. 29, at 2. Shortly after Mr. Ramirez

presented himself, CBP determined that he was inadmissible to the United States because he did not

have a visa or other document that would have allowed him to enter this country legally. Bacchus

Decl. ¶ 4; *see also* R&R at 2. Therefore, CBP served Mr. Mendez Ramirez with a Notice to Appear

("NTA") which charged him as removable pursuant to 8 U.S.C. § 1182(a)(4)(A)(i) and 8 U.S.C.

§ 1182(a)(7)(A)(i)(I).

CBP also determined that Mr. Mendez Ramirez was a UAC and thus transferred him into

the custody of ORR. Bacchus Decl. ¶ 4; *see also* R&R at 3. On June 30, 2018, ORR released Mr.

Mendez Ramirez pursuant to a Sponsor Care Agreement to live his mother, who lives in Newburgh,

New York. Bacchus Decl. ¶ 5; *see also* R&R at 3; Verification of Release, Ex. B to Pet., Dkt No. 1-7;

Sponsor Care Agreement, Office of Refugee Resettlement.[3] On August 7, 2018, ICE filed the NTA

with the Executive Office for Immigration Review, which commenced removal proceedings against

Mr. Mendez Ramirez. Bacchus Decl. ¶ 6. An Immigration Judge ("IJ") held a hearing in Mr.

Mendez Ramirez's case on November 28, 2018. *Id.* ¶ 8. However, Mr. Mendez Ramirez did not

receive notice of the hearing, so he failed to appear. *Id.*; Pet. ¶¶ 23, 28. The IJ ordered Mr. Mendez

Ramirez removed *in abstentia*. Bacchus Decl. ¶ 8; *see also* R&R at 4.

---

[2] The Court makes the following findings of fact, which are undisputed unless otherwise noted. *See* 28 U.S.C. § 2243 ("The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."); *see also Maldonado v. Lloyd*, No. 18 CIV. 3089 (JFK), 2018 WL 2089348, at *1 (S.D.N.Y. May 4, 2018). Some of the facts are drawn from Mr. Mendez Ramirez's habeas corpus petition (the "Petition" or "Pet."). Dkt No. 1.

[3] *See* https://www.acf.hhs.gov/sites/default/files/orr/frp_4_sponsor_care_agreement_2019_06_27.pdf.

Mr. Mendez Ramirez turned eighteen years old in December 2018. On May 6, 2019, Mr. Mendez Ramirez was charged with two misdemeanors under New York state law. Bacchus Decl. ¶ 9; *see also* R&R at 4. Those charges were dismissed on October 28, 2019. R&R at 5. Nevertheless, while the misdemeanor charges were still pending, ICE agents arrested Mr. Mendez Ramirez at the Newburgh City Court, at which Mr. Mendez Ramirez appeared for a proceeding in June 2019. Bacchus Decl. ¶ 11; *see also* R&R at 4. He has been detained at the Orange County Correctional Facility in New York since June 10, 2019 pursuant to Section 1225(b)(2)(A). Bacchus Decl. ¶ 12.

While in custody awaiting deportation, Mr. Mendez Ramirez moved to stay his deportation and reopen his immigration proceeding. *Id.* ¶ 13; *see also* R&R at 5. Those motions were granted in June 2019. Bacchus Decl. ¶ 13; *see also* R&R at 5. On August 26, 2019, Mr. Mendez Ramirez appeared by video teleconference ("VTC") for a master calendar hearing. Bacchus Decl. ¶ 16. At that hearing, the presiding IJ granted a motion by Mr. Mendez Ramirez's prior counsel to withdraw. *Id.* Because prior counsel had been involved in discussions with potential new counsel for Mr. Mendez Ramirez, ICE requested that Mr. Mendez Ramirez be directed to file any application for relief from removal at the next scheduled hearing. *Id.* The IJ scheduled another master calendar hearing for September 16, 2019. *Id.*

At the September 16, 2019 hearing, Mr. Mendez Ramirez appeared *pro se* by VTC. The presiding IJ adjourned the hearing to allow Mr. Mendez Ramirez to secure new counsel. *Id.* ¶ 17. At another master calendar hearing on September 30, 2019, Mr. Mendez Ramirez again appeared *pro se* by VTC. *Id.* ¶ 18. The presiding IJ asked Mr. Mendez Ramirez if he wanted the proceeding to be adjourned so that he could obtain counsel, and Mr. Mendez Ramirez responded affirmatively. *Id.* Therefore, the IJ again adjourned the master calendar hearing to permit Mr. Mendez Ramirez to secure counsel. *Id.*

On October 28, 2019, Mr. Mendez Ramirez appeared by VTC with counsel appearing in person for another master calendar hearing. *Id.* ¶ 19. At that hearing, ICE served evidence to

support the charges of removability.  Pet. ¶ 34.  The presiding IJ adjourned the proceedings to give

Mr. Mendez Ramirez's counsel an opportunity to review ICE's newly submitted evidence.  *Id.*;

Bacchus Decl. ¶ 19.  On November 4, 2019, Mr. Mendez Ramirez again appeared by VTC with

counsel appearing in person for another master calendar hearing.  *Id.* ¶ 20.  At that hearing, counsel

for Mr. Mendez Ramirez argued that the NTA in his case was defective because it failed to state the

location of the immigration court in which his proceeding would be held and made an oral motion

to terminate the proceedings for lack of jurisdiction.  Pet. ¶ 35.  The IJ requested briefing on the

issue and adjourned the case to November 25, 2019.  *Id.*; Bacchus Decl. ¶ 20.

On November 13, 2019, Mr. Mendez Ramirez filed a parole request with ICE.  Pet. ¶ 39.  At

the November 25, 2019 hearing, the IJ orally denied Mr. Mendez Ramirez's motion to terminate.

*Id.* ¶ 35.  At that hearing, Mr. Mendez Ramirez also filed an asylum application.  *Id.* ¶ 36.  The

presiding IJ scheduled a merits hearing on the asylum application for January 28, 2020.  *Id.*

On December 6, 2020, ICE denied Mr. Mendez Ramirez's request for parole.  *See* Parole

Denial Letter, Ex. 4 to Return, Dkt No. 12-4.  In a letter signed by Defendant Thomas Decker, the

Field Office Director of the New York City Field Office of ICE, ICE stated that it had reviewed Mr.

Mendez Ramirez's immigration history, the basis for his removal, the criminal charges against him,

and the information provided in his request for release.  *See id.*  The letter concluded:  "After a

thorough review of all factors in this case[,] it has been determined that your request for release

from ICE custody is denied."  *Id.*

After the merits hearing on Mr. Mendez Ramirez's asylum application on January 28, 2020,

an IJ issued a written decision granting Mr. Mendez Ramirez's asylum claim on February 19, 2020.

*See* Dkt No. 28.  The government timely appealed that decision on March 19, 2020.  *See* Dkt No. 31.

As far as the Court is aware, that appeal remains pending.

### C. Procedural History

Mr. Mendez Ramirez also filed this Petition seeking release from detention on November 28, 2019.  Dkt No. 1.  The Petition asserts three claims for relief.  First, the Petition asserts that ICE acted contrary to Section 1232(c)(2)(B) of the TVPRA and 5 U.S.C. § 706(2)(A) of the Administrative Procedure Act ("APA") because ICE did not make a "least restrictive setting" determination as required by Section 1232(c)(2)(B).  Pet. ¶¶ 71-76.  Second, the Petition asserts that Mr. Mendez Ramirez's due process rights have been violated because he has not received adequate process to challenge his detention.  *Id.* ¶¶ 77-83.  Third, the Petition asserts another violation of Mr. Mendez Ramirez's due process rights because he argues that prolonged civil detention pursuant to Section 1225(b) absent a bond hearing is unconstitutional as applied in these circumstances.  *Id.* ¶¶ 84-87.

Judge Parker issued her Report and Recommendation recommending that Mr. Mendez Ramirez's petition be granted on March 4, 2019.  Dkt No. 29.  Pro bono counsel for Mr. Mendez Ramirez filed a request for immediate release pursuant to *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2011), on March 23, 2020.  Dkt No. 33.  The Government filed objections to the Report and Recommendation on March 25, 2020.  Dkt No. 36.  The Government filed its opposition to Mr. Mendez Ramirez's request for immediate release on March 26, 2020.  Dkt No. 37.  Mr. Mendez Ramirez filed his reply to the Government's opposition to his request for immediate release on March 27, 2020.  Dkt No. 38.  Mr. Mendez Ramirez filed his response to the Government's objections to Judge Parker's Report and Recommendation on April 2, 2020.  Dkt No. 41.

## II. LEGAL STANDARD

### A. Objections to a Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  Parties may raise specific, written objections to the report and

recommendation within fourteen days of being served with a copy of the report.  *Id.*; *see also* Fed. R. Civ. P. 72(b)(2).  When a party timely objects to a magistrate's report and recommendation, a district court reviews, *de novo*, "those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  The Government has properly objected to the entire Report and Recommendation, so the Court reviews it *de novo* in its entirety.

### B. Habeas Petition Brought Under 28 U.S.C. § 2241

Mr. Mendez Ramirez brings this petition for a writ of habeas corpus under 28 U.S.C. § 2241. Section 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)).  "Federal courts have jurisdiction to hear habeas corpus claims by non-citizens challenging the constitutionality of their detention." *Lopez*, 2018 WL 2932726, at *6 (citing *Demore v. Kim*, 538 U.S. 510, 516-17 (2003)).  "Jurisdiction over 28 U.S.C. § 2241 habeas petitions is properly limited to purely legal statutory and constitutional claims and does not extend to review of discretionary determinations by immigration judges."  *Id.* (quotation and brackets omitted).  The Court must "summarily hear and determine the facts, and dispose of the matter as law and justice require."  28 U.S.C. § 2243.

## III. DISCUSSION

### A. TVPRA and APA Claim

Mr. Mendez Ramirez was not entitled to a "least restrictive setting" determination under Section 1232(c)(2)(B) because he was neither a UAC nor in ORR custody when he was arrested by ICE.  In the Petition, Mr. Mendez Ramirez argues that the Government violated the APA "by failing to make a 'least restrictive setting' determination" pursuant to Section 1232(c)(2)(B) when Mr. Mendez Ramirez was arrested by ICE.  Pet. ¶ 72.  Section 1232(c)(2)(B) requires DHS to make a least restrictive setting determination in limited circumstances.  Specifically, that provision applies

only to a person who "satisfies three preconditions: (1) he or she was 'a minor described in subparagraph (A) [*i.e.*, a UAC in the custody of the Secretary of Health and Human Services[4]]'; (2) who 'reaches 18 years of age'; and (3) is 'transferred to the custody of the Secretary of Homeland Security.'" *Jose L.P.*, 2019 WL 8138422, at *5 (quoting 8 U.S.C. § 1232(c)(2)(B)). Thus, Mr. Mendez Ramirez was entitled to a "least restrictive setting" determination only if he satisfied these three preconditions.

Mr. Mendez Ramirez ceased to be a UAC when ORR determined that his mother was available to provide for his care and physical custody. "The TVPRA incorporates [Section 279(g)]'s definition of 'unaccompanied alien child' by reference[.]" *Maldonado*, 2018 WL 2089348, at *4 (citing 8 U.S.C. § 1232(g)). Under Section 279(g)(2), a UAC is a person who "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). "Given the conjunctive phrasing of § 279(g)(2), an individual satisfies the statutory definition of a UAC only if each of the three prongs—(A), (B), and (C)—are met." *Maldonado*, 2018 WL 2089348, at *5.[5]

Mr. Mendez Ramirez was no longer "unaccompanied" when ORR determined that his mother was available to provide for his care and physical custody. To qualify as a UAC, a minor must not have a "parent or legal guardian in the United States . . . available to provide care and physical custody." 6 U.S.C. § 279(g)(2)(C)(ii). Thus, when ORR determined that Mr. Mendez Ramirez's mother was available to provide for his care and physical custody, he no longer satisfied the statutory definition and ceased to be properly classified as a UAC. *See Jose L.P.*, 2019 WL

---

[4] "A 'minor described in subparagraph (A)' is 'an unaccompanied alien child in the custody of the Secretary of Health and Human Services.'" *Jose L.P. v. Whitaker*, No. CV 18-17176 (KM), 2019 WL 8138422, at *6 (D.N.J. Sept. 24, 2019) (quoting 8 U.S.C. § 1232(c)(2)(A)).

[5] Neither party disputes, and the record confirms, that Mr. Mendez Ramirez does not have lawful immigration status in the United States, as required by the first prong of Section 279(g)(2).

8138422, at *6-7 (reaching the same conclusion in materially indistinguishable factual circumstances); *see also Maldonado*, 2018 WL 2089348, at *5 ("[A] child is not 'unaccompanied'—and, therefore, neither a UAC nor properly within ORR's regulatory ambit—if a parent is physically present in the United States and, as a practical matter, is available to provide care and physical custody." (footnote omitted)). Because this statutory text is unambiguous, the Court need look no further than the text itself to determine the meaning of Section 279(g)(2). *See United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well.") (citations omitted); *see also Fowlkes v. Thomas*, 667 F.3d 270, 272 (2d Cir. 2012) ("Where the words of a statute are unambiguous, our inquiry is generally confined to the text itself.") (citation omitted).[6]

Mr. Mendez Ramirez also ceased to be a UAC when he turned eighteen in December of 2018. Even if Mr. Mendez Ramirez was not "unaccompanied" when he was released to live with his mother, he was not an unaccompanied alien *child* after he turned eighteen. *See* 6 U.S.C. § 279(g)(2)(B); *Matter of Castro-Tum*, 27 I. & N. Dec. 271, 277 n.4 (2018) (relying on the definition set forth in 6 U.S.C. § 279(g)(2) to hold that "[a]t a minimum, . . . the respondent ceased to qualify as an unaccompanied alien child on January 10, 2015, his eighteenth birthday"), *abrogated on other grounds*,

---

[6] According to the plain text of Section 1232(c)(2), it appears that ORR does not have authority to release a UAC into the custody of a sponsor who is also the minor's parent. That is because, when ORR determines that a parent is available as a sponsor, it follows *a fortiori* that the parent is "available to provide custody and physical care of the minor." 6 U.S.C. § 279(g)(2)(C)(ii). In that circumstance, the minor is not a UAC and ORR does not have jurisdiction over her because ORR has jurisdiction only over UACs. *See, e.g., Cardall*, 826 F.3d at 748. Because ORR does not have statutory authority over non-UACs, the former UAC is then properly within the jurisdiction of DHS. Minors in DHS custody are subject to the *Flores* Settlement, which "favors family reunification, and states the order of preference for persons into whose custody detained minors are to be released, provided that detention is not required to secure their appearance before immigration authorities or to ensure the safety of themselves or others." *Flores I*, 862 F.3d at 869 (citation omitted).

An observer may reasonably question whether this result is desirable as a policy matter. If ORR discovers that a UAC has a parent in the United States who is willing and able to care for her, it is reasonable to question whether the most efficient outcome is that the minor be transferred to DHS custody, rather than released by ORR to live with that parent. Pursuant to the *Flores* Settlement, minors in this circumstance will often be released by DHS to the parent that ORR has identified in any event. However, "[w]hether or not the Government's theory is desirable as a matter of policy," a court's "job is to follow the text[.]" *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2169 (2015) (quotation omitted). Congress may, of course, choose to step in to address this perceived anomaly. But the Court must apply the statutory text as written.

*Romero v. Barr*, 937 F.3d 282 (4th Cir. 2019); *see also Cortez-Vasquez v. Holder*, 440 F. App'x 295, 298 (5th Cir. 2011) (concluding that the "TVPRA is inapplicable" because an alien was not a UAC because "he had attained eighteen years of age and had reunited with his family in the United States"). For those reasons, Mr. Mendez Ramirez was not a UAC when he was arrested by ICE and was not entitled to a least restrictive setting determination under Section 1232(c)(2)(B).

This conclusion accords with a regulation that specifically addresses arriving aliens who are designated as UACs but cease to meet the statutory definition. Under Section 236, "[w]hen an alien previously determined to have been a UAC has reached the age of 18, when a parent or legal guardian in the United States is available to provide care and physical custody for such an alien, or when such alien has obtained lawful immigration status, the alien is no longer a UAC." 8 C.F.R. § 236.3(d)(2).[7] Moreover, "[a]n alien who is no longer a UAC is not eligible to receive legal protections limited to UACs under the relevant sections of the Act." *Id.*

The Court's conclusion also accords with the *Maldonado* court's analysis. In that case, the court "analyz[ed] the ordinary meaning of the text of § 279(g)(2)(C)(ii)" and "conclude[d] that" because a minor's mother was "'available to provide care and physical custody,'" the minor was "not properly classified as a UAC." *Maldonado*, 2018 WL 2089348, at *5. *Maldonado* noted that "the record belie[d] the proposition that" the minor at issue in that case was "'unaccompanied' in a statutorily relevant sense" because "[a]t the time he was arrested, [the minor] was residing with his mother[.]" *Id.* at *6. The same is true here.

Based on this statutory analysis, the Court respectfully disagrees with Judge Parker's determination to the contrary. Judge Parker reasonably relied on the only published opinion in this district to address the issue. *See* R&R at 11-13 (citing *Lopez*, 2018 WL 2932726, at *9-15). In *Lopez*, an immigrant detainee brought a habeas action, alleging violations of the TVPRA and APA. 2018

---

[7] This provision went into effect on October 22, 2019. *See id.* Inexplicably, however, the Government failed to cite it in any of its briefing in this case.

WL 2932726, at *1.  Like Mr. Mendez Ramirez in this case, the petitioner in *Lopez* was seventeen years old when he arrived at the border, was designated as a UAC, and was released into the custody of his mother pursuant to a Sponsor Care Agreement.  *Id.* at *2-3.  Also like Mr. Mendez Ramirez, the petitioner in *Lopez* was arrested by ICE after his eighteenth birthday.  *Id.* at *3.  *Lopez* concluded that ICE's failure to make a least restrictive setting determination with respect to the petition violated the TVPRA.  *Id.* at *7.

  *Lopez* did not consider whether the petitioner ceased to qualify as a UAC pursuant to the statutory definition when ORR determined that his mother was available to provide care and physical custody or after his eighteenth birthday.  Rather, *Lopez* focused its analysis on whether the petitioner in that case was in ORR "custody" when he was released to live with his mother pursuant to a Sponsor Care Agreement.  *Id.* at *8-10.  Because of *Lopez*'s failure to address the antecedent statutory question of whether the petitioner qualified as a UAC when he was arrested by ICE, the has limited persuasive value.  *Lopez* also could not consider Section 236.3(d)(2)—which specifically states that UACs who no longer meet the statutory definition are not entitled to legal protections applicable to UACs—because that regulatory provision went into effect after the *Lopez* court rendered its decision.

  The Court also respectfully disagrees with *Lopez*'s conclusion that a minor who does not meet the statutory definition of a UAC is in ORR "custody" when he is released pursuant to a Sponsor Care Agreement.  Relying on *Lopez*, Judge Parker held that "the text of Section 1232(c)(2)(B) is not limited to former UACs in the *physical* custody of HHS at the time of a transfer to the custody of DHS."  R&R at 17; *see also Lopez*, 2018 WL 2932726, at *9.  It is true that the term "custody" admits of some ambiguity in some circumstances.  Judge Parker correctly noted that those who are "subject to restraints not shared by the public generally" can sometimes be considered to be in "custody" in a legal sense, even if they are not physically detained by the Government.  R&R at 18 (quoting *Hensley v. Mun. Court, San Jose-Milpitas Judicial Dist., Santa Clara Cty.*, 411 U.S. 345, 351

14

(1973)) (quotation marks omitted). Judge Parker reasoned that because "there are conditions of release outlined in a Sponsorship Agreement," because Section 1232(c) "directs HHS to conduct follow-up services during the pendency of removal proceedings for certain children," and because ORR "is required to provide custodians with legal orientation presentations, ensure the child has legal representation for immigration proceedings, and protect the child from mistreatment, exploitation, and trafficking during the pendency of removal proceedings . . ., HHS had custody over Petitioner up until his arrest by ICE[.]" *Id.* at 17-18.

The Court cannot agree that ORR had custody over Mr. Mendez Ramirez after it had determined that his mother was available to provide care and physical custody and after he turned 18. For the reasons set forth above, Mr. Mendez Ramirez ceased to qualify as a UAC when he no longer met the statutory definition. Because Mr. Mendez Ramirez was not a UAC, ORR did not have statutory authority to retain custody over him. *See Cardall*, 826 F.3d at 748 ("A quick skim of the statutes makes plain that the Office's authority runs only to UACs; every relevant statutory grant of authority to the Office is conditioned on the existence of an unaccompanied alien child. This fact is important, as 'an agency literally has no power to act unless and until Congress confers power upon it.'") (quoting *New York v. FERC*, 535 U.S. 1, 18 (2002)) (ellipsis omitted); *see also Maldonado*, 2018 WL 2089348, at *6 ("[N]o provision of the HSA or TVPRA appears to empower ORR to detain a child who . . . is not a UAC."). ORR appears to have acknowledged this limitation on its authority in previous litigation. *See Cardall*, 826 F.3d at 749 n.3 ("[ORR] appears to concede that its authority ends once an individual ceases to be an 'unaccompanied alien child.' It recognizes that its authority ends once [a minor] turns eighteen.") (quotation omitted).

This conclusion is consistent with ORR guidance. An ORR Policy Guide entitled "Children Entering the United States Unaccompanied" states that "[o]nce a child is released to a sponsor, ORR's custodial relationship with the child terminates." Children Entering the United States

Unaccompanied § 2.8.3;[8] *see also id.*, Introduction ("Unaccompanied alien children remain in ORR's care and custody until they are released to a parent or other sponsor in the United States, are repatriated to their home country, obtain legal status, or turn 18 years old, at which time they are transferred to the custody of DHS.") It is also consistent with ORR's "understanding of the applicable statutes and the scope of ORR's authority" as expressed in prior litigation. *Maldonado*, 2018 WL 2089348, at *6. In *Maldonado*, ORR "acknowledge[d] that when" a minor "attain[ed] eighteen years of age—i.e., when he ceases to be a 'child' in the UAC formulation—he will no longer be subject to ORR custody[.]" *Id.* (quotation omitted). Although this interpretation of Section 1232(b)(2)(C) is not entitled to deference, it has persuasive value in the Court's interpretation of the statute.

The Court also respectfully disagrees with the *Lopez* court's conclusion that "there is an irreconcilable conflict between § 1232(c)(2)(B) on the one hand, which provides for release of adults who, like Lopez, reach majority while in HHS custody, and 8 C.F.R. § 1003.19(h)(2)(i)(B) on the other, which prohibits immigration judges from conducting bond hearings for removable adults, [so] the latter is impliedly revoked as irreconcilable with, and older than, the former." *Lopez*, 2018 WL 2932726, at *10 (citing *Watt v. Alaska*, 451 U.S. 259, 266 (1981) (recognizing "the maxim of construction that the more recent of two irreconcilably conflicting statutes governs")). "Repeal by implication is disfavored" and "the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Garfield v. Ocwen Loan Servicing, LLC*, 811 F.3d 86, 89 (2d Cir. 2016) (quotation omitted).

Section 1232(c)(2) and Section 1003.19(h)(2)(i)(B) are not in conflict, much less irreconcilable conflict. Section 1003.19(h)(2)(i)(B) prohibits bond hearings for arriving aliens; Section 1232(c)(2) carves out UACs—a subset of arriving aliens who meet a specific statutory

_____
[8] *See* https://www.acf.hhs.gov/orr/resource/childrenentering-the-united-states-unaccompanied-0.

definition—for certain special protections. When a UAC "reaches 18 years of age," 8 U.S.C. § 1232(c)(2)(B), she is no longer a UAC and loses the special protections afforded to that subclass of arriving aliens. Consequently, she is once again subject to the general rules for arriving aliens, including Section 1003.19(h)(2)(i)(B)'s prohibition on bond hearings. The Court perceives no conflict between these provisions.

Nor is there an irreconcilable conflict between Sections 1232(c)(2)(B) and 1225(b)(2)(A). At first blush, these sections might appear to be in tension. On the one hand, Section 1225(b)(2)(A) subjects arriving aliens to mandatory detention during the pendency of their removal proceedings. On the other hand, Section 1232(c)(2)(B) requires DHS to make a least restrictive setting determination for former UACs who are transferred from ORR to DHS custody and instructs that former UACs "shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home." 8 U.S.C. § 1232(c)(2)(B).

To the extent there is any conflict between these provisions, the way to reconcile them is to interpret Section 1232(c)(2)(B) as requiring DHS to undertake a "least restrictive setting" determination to inform the exercise of its discretionary parole authority under Section 1182(d)(5)(A). As noted above, under Section 1182(d)(5)(A), DHS may temporarily parole arriving aliens into the United States "under such conditions as [it] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Thus, Section 1232(c)(2)(B)'s directive that DHS "consider placement [of a former UAC who reaches the age of eighteen and is transferred to DHS custody] in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight" can be read to inform DHS's exercise of its discretionary parole authority. *Id.* § 1232(c)(2)(B).

This interpretation is consistent with the remainder of Section 1232(c)(2)(B), which states that former UACs who reach the eighteen years of age and are transferred into DHS custody "shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home." *Id.* Pursuant to its ability to parole arriving aliens "under such conditions as [it] may prescribe," *id.* § 1182(d)(5)(A), DHS can exercise its discretionary authority to place former UACs subject to Section 1232(c)(2)(B) into the "alternative to detention programs" referred to in that section. *Id.* § 1232(c)(2)(B). Consequently, former UACs subject to Section 1232(c)(2)(B) are "eligible to participate" in these programs by virtue of DHS's ability to exercise its discretionary parole authority to place them there.

To be sure, Congress was not as clear as it might have been that Section 1232(c)(2)(B)'s references to a "least restrictive setting determination" and "alternative to detention programs" were meant to inform DHS's exercise of its discretionary parole authority. Indeed, Section 1232(c)(2)(B) does not explicitly refer to this authority. However, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotations omitted). The Court's interpretation fits the existing statutory and regulatory framework into a coherent scheme. The alternative is to conclude, as did *Lopez*, that Section 1232(c)(2) repealed a different statutory provision by implication. But repeal by implication is a last resort and, because there is not an irreconcilable conflict between Sections 1232(c)(2)(B) and 1225(b)(2)(A), the Court does not agree that its application is warranted here.[9]

---

[9] For these reasons, Mr. Mendez Ramirez's argument that Section 1232(c)(2)(B) implicitly repealed Section 1225(b)(2) as applied in these circumstances is unavailing.

Accordingly, Mr. Mendez Ramirez was not a UAC when he was arrested by ICE. He therefore was not entitled to a "least restrictive setting" determination under Section 1232(c)(2)(B), and ICE's alleged failure to make such a determination was not a violation of the APA.

Mr. Mendez Ramirez's arguments to the contrary are unavailing. Mr. Mendez Ramirez first argues that "[o]nce accorded [UAC] status, UACs do not lose it unless it is affirmatively re-determined by the agency." Response to Government's Objections to R&R ("Resp."), Dkt No. 41, at 9. This "once a UAC, always a UAC" argument is not supported by any citation to legal authority. It is also inconsistent with the statutory text of Section 1232(c)(2), and it is directly contradicted by Section 236.3(d)(2). Section 236.3(d)(2) states that "[w]hen an alien previously determined to have been a UAC has reached the age of 18, when a parent or legal guardian in the United States is available to provide care and physical custody for such an alien, or when such alien has obtained lawful immigration status, the alien is no longer a UAC. *An alien who is no longer a UAC is not eligible to receive legal protections limited to UACs* under the relevant sections of the Act." 8 C.F.R. § 236.3(d)(2) (emphasis added). This provision forecloses the argument that DHS must affirmatively redetermine a former UAC's status; a UAC ceases to be a UAC when she no longer meets the statutory definition. Moreover, Mr. Mendez Ramirez's interpretation "place[s] no age limit on the applicability of this provision of the TVPRA, and instead would extend the statute's protections indefinitely to all former UAC who age out of ORR custody"—even if a former UAC "had been re-detained by ICE at age 25 or age 55." Government Objections to R&R ("Obj."), Dkt No. 36, at 17. Hence, Mr. Mendez Ramirez's argument that a former UAC retains protection under the TVPRA even after she no longer meets the statutory definition of a UAC is unpersuasive.

Mr. Mendez Ramirez also argues that on the Court's interpretation, "[t]he notion that UAC protections end when a child is released under a Sponsor Care Agreement leads to an absurd result not intended by Congress" because on the Court's interpretation, "a child loses UAC status the day he or she is released under a Sponsor Care Agreement." Resp. at 10. That is incorrect. An arriving

alien is no longer a UAC when ORR determines that she has a parent who is "available to provide care and physical custody" or otherwise does not meet the statutory definition of a UAC. 6 U.S.C. § 279(g)(2)(C)(ii). The release of a UAC pursuant to a Sponsor Care Agreement has no effect on the UAC's status. If a UAC meets the statutory definition, she continues to enjoy the TVPRA's protections even after she has been released pursuant to a Sponsor Care Agreement. This is entirely consistent with the legislative history cited by Mr. Mendez Ramirez that "[a]ll agree UACs remain UACs under the TVPRA statutory definition even after placement with sponsors." Resp. at 11 (quoting Permanent Subcommittee On Investigations, United States Senate, *Protecting Unaccompanied Alien Children from Trafficking and Other Abuses: The Role of the Office of Refugee Resettlement (Staff Report)* at 41 (brackets omitted)).[10] To the extent that an arriving alien does not meet the statutory definition of an arriving alien, however, the TVPRA does not apply.[11]

 As noted above, it is true that the plain text of Section 1232(c)(2)(B) appears to preclude ORR from releasing a minor to a parent pursuant to a Sponsor Care Agreement, whereas a child may be released to a non-parent sponsor so long as her parent is not available to provide care and physical custody and she otherwise satisfies the statutory definition of a UAC. *See* n.6, *supra*. Even if unwise as a matter of policy, the Court does not agree that this outcome is so "manifestly absurd" that it justifies departing from the plain meaning of Section 1232(c)(2)(B). *Dubroff v. First Nat'l Bank (In re Dubroff)*, 119 F.3d 75, 76 (2d Cir. 1997). It is an "exceptionally rare occurrence" for a court to conclude that a result is so absurd that a legislature cannot have meant what it said in a statute's text. *Id.* (citing *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 472 (1997)).

---

[10] *See* https://www.hsgac.senate.gov/imo/media/doc/Majority%20&%20Minority%20Staff%20Report%20-%20Protecting%20 Unaccompanied%20Alien%20Children%20from%20Trafficking%20and%20Other%20Abuses %202016-01-282.pdf.

[11] For the same reasons, Mr. Mendez Ramirez's argument that on the Court's interpretation ORR "is 'powerless' to intervene after releasing a UAC on a Sponsor Care Agreement" is incorrect. Resp. at 14. If an arriving alien qualifies as a UAC, ORR retains statutory authority over that UAC even after she is released pursuant to a Sponsor Care Agreement. However, if an arriving alien does not meet the statutory definition of a UAC, ORR does not have statutory authority over the arriving alien.

The Court cannot conclude that this is one of those exceptionally rare occurrences because minors in DHS custody may still be released into the custody of a parent who is available to provide custody and care. DHS has an obligation to consider releasing minors who meet certain conditions into the custody of their parents pursuant to the *Flores* Settlement. *See Flores I*, 862 F.3d at 869. In addition, DHS can choose to exercise its discretionary parole authority to release minors to live with their parents under Section 1182(d)(5)(A). Indeed, a regulation implementing that provision contemplates that DHS will retain custody over at least some minors whose parents are living in the United States. *See* 8 C.F.R. § 212.5(b)(3)(i) (providing that a DHS should consider exercising its discretionary parole authority to "release[] [minors] to a parent, legal guardian, or adult relative . . . not in detention"). Although the process contemplated by the statutory framework—under which ORR is required to transfer a minor in its custody into DHS custody only after it determines that the minor's parent is available to provide physical custody and care—may be bureaucratically inefficient, the Court cannot conclude on that basis that the result is absurd. Hence, Mr. Mendez Ramirez cannot clear the high bar necessary to overcome congressional intent, as expressed in the unambiguous statutory language of Section 1232(c)(2)(B).

Mr. Mendez Ramirez also argues that Section 1232(c)(2)(B) cannot apply only to those who satisfy the statutory definition of a UAC because Section 1232(c)(2)(B) applies only to those who have reached the age of 18 and thus applies only to individuals outside that statutory definition. But there is nothing anomalous about the Court's interpretation with respect to this point. Section 1232(c)(2)(B) applies to UACs who "reach[] 18 years of age" while in ORR's physical custody. 8 U.S.C. § 1232(c)(2)(B). When they reach the age of 18, former UACs are no longer subject to Section 1232(c)(2) and should be "transferred to the custody of the Secretary of Homeland Security." *Id.* Thus, contrary to Mr. Mendez Ramirez's assertions, Section 1232(c)(2)(B) does not apply to "no one," but rather applies to UACs who reach the age of eighteen while in ORR's physical custody.

Mr. Mendez Ramirez next argues that the Government's position is contrary to a September 2012 United States Citizenship and Immigration Services ("USCIS") memorandum that extends TVPRA protections to individuals even if they no longer satisfy the UAC statutory definition.  *See* Resp. at 12 (citing Memorandum from Ted Kim, Acting Chief, Asylum Division to Donald Neufeld, Associate Director, Service Center Operations (May 28, 2013) ("Kim Memo");[12] *see also* Citizenship and Immigration Services Ombudsman, *Ensuring a Fair and Effective Asylum Process for Unaccompanied Children* (Sept. 20, 2012);[13] *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 373-74 (D. Md. 2019).

To the extent the Kim Memo still applies and is relevant to this case,[14] the Court declines to apply it in these circumstances because it is inconsistent with the text of Section 1232(c)(2)(B).  As an initial matter, if the Kim Memo applies here, it is contradicted by Section 236.3(d)(2).  That section explicitly rejects the position that former UACs are entitled to protection under the TVPRA.  Moreover, because the Kim Memo is not a "[f]ormal adjudication[]" or an "agency-promulgated rule[]" but rather an "informal agency interpretation," the Court is bound to defer to it only insofar as it is persuasive.  *Buffalo Transp., Inc. v. United States*, 844 F.3d 381, 385 (2d Cir. 2016) (citations omitted); *see also Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); *United States v. Mead Corp.*, 533 U.S. 218

---

[12] *See* https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/Minor%20Children%20Applying%20for%20Asylum%20By%20Themselves/determ-juris-asylum-app-file-unaccompanied-alien-children.pdf.

[13] *See* https://www.dhs.gov/sites/default/files/publications/cisomb-ensuring-fair-asylum-process-for-uac.pdf.

[14] USCIS has subsequently revised its policy as stated in the Kim Memo.  *See* Memorandum from John Lafferty, Chief Asylum Division to All Asylum Office Staff (May 31, 2019) ("Lafferty Memo"), https://www.uscis.gov/sites/default/files/USCIS/Refugee%2C%20Asylum%2C%20and%20Int%27l%20Ops/Asylum/Memo_-_Updated_Procedures_for_I-589s_Filed_by_UACs_5-31-2019.pdf.  *J.O.P.* enjoined enforcement of the Lafferty Memo because the agency did not promulgate the Lafferty Memo through notice and comment rulemaking.  It is not clear that the Lafferty and Kim Memos are relevant to this case, as those memos addressed USCIS policy, and this case involves ICE and ORR.  Moreover, the Court does not necessarily agree with the *J.O.P.* court's conclusion that the Lafferty Memo was required to go through notice and comment rulemaking, given that the Kim Memo did not.  *See J.O.P.*, 409 F. Supp. 3d at 378 n.3 ("The fact that the Kim Memo did not go through notice-and-comment does not impact whether the policy should have since the Kim Memo was not challenged on this basis.").  Ultimately, the Court need not decide either of these questions because the Court concludes that to the extent the Kim Memo is still in effect, it conflicts with the text of Section 1232(c)(2)(B) and the statutory text must control.

(2001)).  For the reasons discussed above, the Court has concluded that the text of Section

1232(c)(2)(B) is clear.  Hence, Mr. Mendez Ramirez's argument premised on the Kim Memo is

unpersuasive.

Finally, Mr. Mendez Ramirez argues that the Court's interpretation "cannot be what

Congress intended."  Resp. at 15.[15]  But time and again, the Supreme Court and the Second Circuit

have held that "courts must presume that a legislature says in a statute what it means and means in a

statute what it says there."  *Dekalb Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 404 (2d Cir.

2016) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)) (brackets omitted).  Courts

may conduct a free-wheeling inquiry into congressional "purpose" or "intent" only where the

statutory text is ambiguous.  *See, e.g.*, *Tanvir v. Tanzin*, 889 F.3d 72, 82 (2d Cir. 2018) ("As in any case

of statutory construction, we start our analysis with the language of the statute.  Where the statutory

language provides a clear answer, our analysis ends there.") (cleaned up).  Here, Section

1232(c)(2)(B) is clear:  It applies only to UACs.  Because Mr. Mendez Ramirez was not a UAC when

he was arrested by ICE, he was not entitled to a least restrictive setting determination under Section

1232(c)(2)(B).  Therefore, his statutory claim for relief is denied.

## B. Due Process Claims

Mr. Mendez Ramirez's detention does not violate due process because Congress has

authorized mandatory detention for immigrants in Mr. Mendez Ramirez's circumstances and that is

sufficient to satisfy due process.  Mr. Mendez Ramirez brings two due process challenges to his

detention.  First, Mr. Mendez Ramirez argues that he has not received adequate procedural due

---

[15] *See also Lopez*, 2018 WL 2932726, at *9 ("The 2013 amendment to the TVPRA requiring the release of UACs who reach the age of eighteen after entry into the U.S. indicates congressional intent to continue to protect vulnerable young people past the age of eighteen."); *id.* ("For Section 1232(c)(2)(B) to protect only minors who attain majority while in the physical custody of HHS, but not those over whom the HHS exercises custodial and legal control pursuant to sponsorship agreements, would run counter to the spirit and purpose of the amendment."); *id.* ("Adopting [the Government's] position, that Section 1232(c)(2)(B) only applies to minors who attain majority while in the physical custody of HHS prior to DHS transfer, would exclude the majority of UACs from the re-arrest protections of § 1232(c)(2)(B), thus frustrating the clear purpose of the amended TVPRA.") (citation omitted).

process to challenge his detention. Pet. ¶¶ 77-83. Second, Mr. Mendez Ramirez argues that, absent a bond hearing, his prolonged detention violates his substantive due process rights. *Id.* ¶¶ 84-87.

Mr. Mendez Ramirez was classified as an arriving alien when he first presented himself to immigration authorities at the United States' border. Bacchus Decl. ¶ 4. CBP also determined that Mr. Mendez Ramirez was a UAC and thus transferred him to the custody of ORR. *Id.* As noted above, UACs are a subset of arriving aliens who are entitled to special protections. But for CBP's determination that he was a UAC, Mr. Mendez Ramirez would have been subject to mandatory detention under Section 1225(b)(2)(A) during the pendency of his removal proceedings.

Mr. Mendez Ramirez is still properly classified as an arriving alien, even though he was released to live with his mother pursuant to a Sponsor Care Agreement. Although Mr. Mendez Ramirez was released from ORR custody, he is considered to be "at the threshold of initial entry" for immigration purposes pursuant to the so-called "entry fiction" by which "aliens who have been denied admission to the United States yet are present within its borders are 'treated, for constitutional purposes, as if stopped at the border.'" *Traore v. Ahrendt*, No. 18-cv-794 (JMF), 2018 WL 2041710, at *1 n.2 (S.D.N.Y. Apr. 30, 2018) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)); *see also United States ex rel. Kordic v. Esperdy*, 386 F.2d 232, 235 (2d Cir. 1967). Hence, although Mr. Mendez Ramirez was in the United States for months prior to his detention, he is properly treated "as if stopped at the border" as an arriving alien for purposes of the due process analysis. *Zadvydas*, 533 U.S. at 693 (citation omitted); *see also Clerveaux v. Searls*, 397 F. Supp. 3d 299, 312 (W.D.N.Y. 2019) (relying on *Guzman v. Tippy*, 130 F.3d 64 (2d Cir. 1997), to conclude that a court must treat a paroled alien's due process challenge "as if it were brought by an arriving alien who was not paroled into this country").

Like all arriving aliens who are not "clearly and beyond a doubt entitled to be admitted" to this country, Mr. Mendez Ramirez is subject to mandatory detention. 8 U.S.C. § 1225(b)(2)(A); *see id.* ("[I]f the examining immigration officer determines that an alien seeking admission is not clearly

and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title [i.e., a removal proceeding].").  As discussed above, an immigration judge "may not" conduct a bond hearing to determine whether such an arriving alien should be released into the United States during removal proceedings, 8 C.F.R. § 1003.19(h)(2)(i)(B), but DHS may exercise its discretion to release detained aliens in limited circumstances.  *See* 8 U.S.C. § 1182(d)(5)(A); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 843-45 (2018).  In this case, Mr. Mendez Ramirez applied for parole, but the request was denied in December 2019.  Bacchus Decl. ¶ 23.

The outcome of Mr. Mendez Ramirez's due process challenges is controlled by the Supreme Court's decision in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953).  In that case, the Supreme Court held that "[i]t is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."  *Id.* at 212 (citations omitted).  "But," the Supreme Court continued, "an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Id.* (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).  That holding squarely forecloses Mr. Mendez Ramirez's due process arguments in this case.  He does not contest that Congress authorized mandatory detention for arriving aliens under Section 1225(b)(2)(A). Accordingly, Mr. Mendez Ramirez's detention comports with due process.

*Poonjani v. Shanahan* is in accord.  319 F. Supp. 3d 644 (S.D.N.Y. 2018) (Sullivan, J.).  The petitioner in *Poonjani* argued that the "prospect of indefinite and prolonged detention poses serious constitutional problems that compel relief in the form of a bond hearing."  *Id.* at 647 (quotation omitted).  The *Poonjani* court rejected the argument, holding that *Mezei* "is directly on point and controls this case."  *Id.*  *Poonjani* held that "because the immigration statutes at issue here do not authorize a bond hearing, *Mezei* dictates that due process does not require one here."  *Id.* at 649. The same result is warranted in this case.

Mr. Mendez Ramirez's argument against this conclusion is unpersuasive. Mr. Mendez Ramirez points to other decisions in this District that have attempted to distinguish *Mezei* on the grounds that *Mezei* was decided under a statutory scheme that is no longer "in force and effect," *Perez v. Decker*, No. 18-CV-5279 (VEC), 2018 WL 3991497, at *3 (S.D.N.Y. Aug. 20, 2018), or that *Mezei* "tailored its holding to the national security context"[16] in which it arose. *Lett v. Decker*, 346 F. Supp. 3d 379, 386 (S.D.N.Y. 2018). *Poonjani* rejected both of these arguments, reasoning that "neither the particular facts justifying Petitioner's detention nor subsequent changes in the immigration laws permit this Court to ignore the Supreme Court's categorical holding that, for aliens on the threshold of initial entry, 'whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Poonjani*, 319 F. Supp. 3d at 649 (quoting *Mezei*, 345 U.S. at 212) (brackets omitted). The Court agrees with the *Poonjani* court's persuasive analysis. The Supreme Court did not ground its holding in the national security context in which that case arose or in the particular statutory structure in effect when the case was decided. As an "inferior court[]," U.S. Const. Art. III § 1, this Court is bound to apply the Supreme Court's holding in *Mezei*.

Mr. Mendez Ramirez also suggests that the position adopted by the Court implies that he "has *no* due process rights." Resp. at 18. That is incorrect. The issue is not *whether* Mr. Mendez Ramirez has a right to due process, "but rather the *scope* of the constitutional protections available to him—and on that question, *Mezei* is controlling." *Poonjani*, 319 F. Supp. 3d at 650 (emphasis added). "Accordingly, because the statutory language makes clear that aliens detained pursuant to Section 1225(b)(2)(A) have no statutory entitlement to bond hearings, and because *Mezei* instructs that, for aliens on the threshold of initial entry, the Constitution extends no farther than the statutory

---

[16] The petitioner in *Mezei* was "'permanently excluded from the United States' after an extended sojourn behind the Iron Curtain" during the Cold War. *Bermudez Paiz v. Decker*, No. 18-CV-4759 (GHW) (BCM), 2018 WL 6928794, at *11 (S.D.N.Y. Dec. 27, 2018) (quotation omitted).

language itself, *Mezei* compels the conclusion that Petitioner's due process rights have not been infringed." *Id.*

The Court also respectfully disagrees with the argument advanced by at least one court in this Circuit that the Supreme Court could not have meant what it said in *Mezei*. *See Clerveaux*, 397 F. Supp. 3d. at 316 (noting that Justices Scalia and Marshall—in dissenting opinions—have explained that arriving aliens surely could not be subject to "hard labor without a judicial trial," "torture[]," or "mass starvation" (citations omitted)). On its merits, this parade of horribles is of limited persuasive value.[17] But more fundamentally, this argument misapprehends the role of lower courts in our constitutional structure. Lower courts are not empowered to pick and choose which Supreme Court holdings they apply. Indeed, a lower court "has no more power to rewrite binding Supreme Court precedent than it does to 'rewrite a statute as it pleases[.]'" *Poonjani*, 319 F. Supp. 3d at 650 (quoting *Jennings*, 138 S. Ct. at 843). For that reason, "any relief from the clear holding of *Mezei* must come from Congress or the Supreme Court itself." *Id.* (citing *Johnson v. United States*, 135 S. Ct. 2551, 2562-63 (2015) (recognizing that the Supreme Court may overturn its prior precedents)). Until Congress or a higher court says otherwise, this Court is constrained to apply *Mezei*.

Even if the Court concluded that *Mezei* did not foreclose Mr. Mendez Ramirez's due process claim, it would nonetheless conclude that his continued detention does not violate his due process rights. Mr. Mendez Ramirez urges the Court to apply the factors derived from the Supreme Court's decisions in *Zadvydas* and *Demore* and articulated by Judge Nathan in *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *10 (S.D.N.Y. May 23, 2018) to determine if his detention is

---

[17] *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 616 (2012) (Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("When contemplated in its extreme, almost any power looks dangerous. The commerce power, hypothetically, would enable Congress to prohibit the purchase and home production of all meat, fish, and dairy goods, effectively compelling Americans to eat only vegetables. Yet no one would offer the 'hypothetical and unreal possibility,' of a vegetarian state as a credible reason to deny Congress the authority ever to ban the possession and sale of goods.") (quoting *Pullman Co. v. Knott*, 235 U.S. 23, 26 (1914)) (other citations and brackets omitted).

consistent with due process.[18]  An evaluation of those factors in this case does not support the

contention that Mr. Mendez Ramirez's detention violates his constitutional right to due process.

"The first, and most important, factor that must be considered is the length of time the alien

has already been detained."  *Id.*  Here, Mr. Mendez Ramirez has been detained for approximately ten

months.  That is far less time than other courts in this District have held to comport with due

process.  *See, e.g.*, *Traore v. Decker*, No. 19 Civ. 4612 (ALC), 2019 WL 3890227, at *4-6 (S.D.N.Y.

Aug. 19, 2019) (rejecting as-applied due process challenge to 20.5-month mandatory detention of

arriving alien).  Therefore, the length of Mr. Mendez Ramirez's detention does not weigh in favor of

the conclusion that his continued detention violates his due process rights.

"Second, courts should consider whether the alien is responsible for the delay."  *Sajous*, 2018

WL 2357266, at *10.  This factor bears considerable weight in the Court's analysis in this case.  Mr.

Mendez Ramirez sought continuances in his immigration proceeding so that he could obtain counsel

that led to substantial delays in the adjudication of his removal proceedings.  *See* Bacchus Decl.

¶¶ 15-18.  Indeed, Mr. Mendez Ramirez did not file an asylum application until he had been detained

for over five months.  To be sure, there is no evidence that Mr. Mendez Ramirez was attempting to

"gam[e] the system to delay [his] removal [proceeding.]"  *Sajous*, 2018 WL 2357266, at *10 (citation

omitted).  However, it is still relevant that months of the delay in the adjudication of Mr. Mendez

Ramirez's removal proceeding is attributable to his efforts to secure counsel.  Thus, this factor also

weighs against the conclusion that Mr. Mendez Ramirez's continued detention violates due process.

"Third, it may be pertinent whether the detained alien has asserted defenses to removal."  *Id.*

at *11.  "[T]he continued detention of the alien will be more reasonable . . . if the alien ha[s] at least

some possibility of remaining in the country."  *Id.* (citation omitted).  Here, Mr. Mendez Ramirez has

---

[18] *Poonjani* noted that in that case, the "[p]etitioner's status as an alien on the threshold of initial entry distinguishe[d] him
from the petitioner in *Sajous*[.]"  *Poonjani*, 319 F. Supp. 3d at 649 n.4.  The same is true in this case.  Nevertheless, the
Court analyzes the *Sajous* factors as applied to Mr. Mendez Ramirez.

asserted that he is entitled to asylum, and an IJ has granted his asylum application. Consequently, this factor also weighs against the conclusion that Mr. Mendez Ramirez's continued detention violates due process.

*Sajous* also held that "whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention" may be relevant to whether an alien's prolonged detention comports with due process. *Id.* (quotation omitted). This factor weighs in favor of Mr. Mendez Ramirez's claim that his continued detention violates due process; Mr. Mendez Ramirez argues that the Orange County Correctional Facility holds convicted criminals and the Government does not contest the assertion.

There are also other facts that weigh in favor of Mr. Mendez Ramirez's argument that his prolonged detention is a violation of his right to due process. In his request for emergency relief pursuant to the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), Mr. Mendez Ramirez correctly argues that the ongoing Covid-19 pandemic weighs in favor of the conclusion that he should be released from detention. And counsel for Mr. Mendez Ramirez has represented to the Court that his mental health is deteriorating rapidly.

After carefully weighing these factors—though the issue is close—the Court concludes that Mr. Mendez Ramirez's continued detention does not violate due process. Accordingly, Mr. Mendez Ramirez's due process challenges to his detention are denied.[19]

---

[19] Although it has concluded that governing precedent forecloses Mr. Mendez Ramirez's due process challenge, the Court encourages ICE to reevaluate its discretionary parole determination. Mr. Mendez Ramirez has persuasively argued that he is at risk of contracting Covid-19. Moreover, Mr. Mendez Ramirez's youth, his lack of criminal convictions, and his mental health challenges counsel in favor of his release. Moreover, the record in this case demonstrates that Mr. Mendez Ramirez's mother is ready to take custody over him. And an IJ has already granted Mr. Mendez Ramirez's asylum application. In these circumstances, there is a strong argument that there are "urgent humanitarian reasons" weighing in favor of his release and that his release would result in "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The Court observes that courts in this District have granted injunctive relief ordering that alien detainees be released from jails, including the Orange County Correctional Facility, because of the spreading Covid-19 pandemic. *See Coronel v. Decker*, No. 20-CV-2472 (AJN), 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020). Those cases rested upon different ground than this one—namely, asserted violations of petitioners' rights under the Fourteenth Amendment because of the Government's asserted deliberate indifference to their medical needs. The Court understands why the Government has opposed the legal arguments presented to support the Petition in this case, and the Court has concluded that the Government's arguments are legally

**IV. CONCLUSION**

For the foregoing reasons, Mr. Mendez Ramirez's petition for habeas corpus is DENIED.

Mr. Mendez Ramirez's request for emergency relief pursuant to the Second Circuit's decision in

*Mapp v. Reno* is likewise denied. The Clerk of Court is directed to terminate the motion pending at

Dkt No. 1, to enter judgment for Respondent, and to close this case.

SO ORDERED.

Dated: April 3, 2020

_____
GREGORY H. WOODS
United States District Judge

---

correct. But that conclusion does not counsel against the Government reconsidering its parole determination and
releasing Mr. Mendez Ramirez into the custody of his mother.